## S. G. COCHRAN *v.* W. R. BAKER.

1. TAX-TITLE.  *Sales under Abatement Act of 1875.  Nature of title passed.*
   The sales of land provided for by an act of the Legislature approved March 1, 1874, and known in this State as the "Abatement Act," were not intended to pass only such title as the State then held, but were intended to confer a new title deriving its efficacy from the proceedings under that act.

2. SAME.  *Sales under Abatement Act.  Assessment.  Irregularities cured.*
   Sales of land under the Abatement Act of 1875, were not dependent for their validity upon the regularity of the assessment of 1871 (that being the last assessment of land previous to such sales), and of orders of the Boards of Supervisors of the different counties levying taxes for the year 1874.  It was the intent of the act to adopt the assessments in the various counties, as they then appeared, and the levy of taxes for State, county, and levee purposes as then fixed by law and by the orders of the Boards of Supervisors, as establishing the valuation of the lands and the rate of taxation; and it had the effect to cure all irregularities or defects in such assessment and levy of taxes which it was in the power of the Legislature to cure.

3. SAME.  *Irregularitis in assessment.  Obviated by Abatement Act.*
   The failure of the Board of Supervisors of any county to approve the assessment-roll upon which lands were sold under the Abatement Act of 1875, was one of the irregularities which were cured by the operation of that act.

APPEAL from the Chancery Court of Holmes County.

Hon. S. W. WILLIAMSON, Chancellor.

W. R. Baker filed the bill in this case to obtain a decree of confirmation of his title to a certain tract of land bought by him from the State, and which had been previously sold to the State under the act of the Legislature, approved March 1, 1875, and known now as the "Abatement Act." The bill alleged that the land was sold to the State, in 1869, for the taxes of 1868, and not having been redeemed nor purchased, was subject to the provisions of the Abatement Act, under which it was again sold to the State, in 1875 ; and that it was purchased from the State by the complainant, in 1879. The defendant's answer sets up the defences, (1) that the assessment of 1866, upon which the land was sold to the State, in 1869, was void; (2) that the assessments of 1870 and 1871 were illegal, and the sale in 1875, under the Abatement Act,

must have been based upon one of these assessments ; and (3) that if the sale in 1875 was based upon the assessment of 1870, it was invalid because the taxes for which the sale was made exceeded the amount which might have been imposed upon the land as valued in that assessment.   The irregularity which it is alleged rendered the assessment of 1870 void, is that it was not certified until the 2d of January, 1871 ; whereas the law required that it should be certified on the second Monday of August, 1870 ; and that which it is averred invalidated the assessment of 1871, is that it was never approved by the Board of Supervisors of the county.

At the hearing the complainant introduced in evidence the deeds and lists of land necessary to establish his *prima facie* title ; and the defendant adduced proof tending to sustain his defences.   On the fifteenth day of September, 1882, the court rendered a decree of confirmation of the complainant's title to the land in controversy ; and thereupon the defendant appealed.

*Gwin & Noel,* for the appellant.

It is, shown by the proof, beyond the peradventure of a doubt, that the sale of the 5th of July, 1879, is absolutely void, because, as shown by the answer and proof, the assessment-roll of lands for 1866, which was the last before the sale of 1869, was not signed or certified to by the assessor, nor approved by the Board of Supervisors of Holmes County, nor was it filed with the probate clerk, on the first Monday of August, 1866.   It is conceded, however, that that sale of July 5, 1869, was void.   We ask to reiterate the theory and argument presented to this court, when before it on a former appeal, that by the bill which undertakes to show the delinquency under which said lands were sold, when it is shown that the alleged delinquency of 1868 taxes was no delinquency, and no other having been attempted to be shown, the foundation of this suit is destroyed.   It may be true that if complainant had not undertaken to show that there was a delinquency for taxes, which authorized a sale under the Abatement Act,

he might have relied on the deed under the Abatement Act as giving him a *prima facie* title; but having asserted that he claimed from the State, and the State had sold by virtue of a previous sale on July 5, 1869, and we'show said sale was void, it occurs to defendants that that alone should defeat complainant's right for relief. Because, to make a sale valid under the Abatement Act, it is necessary, as repeatedly, announced by this court, that the lands must be delinquent for some year other than the tax of 1874, else the sale will be void, and it is only alleged that it was delinquent for 1868. Now, to take up the two assessment-rolls filed in 1871, one the 2d of January, 1871, and the other the 7th of August, 1871; and first as to the one filed January 2, 1871. If the land was sold under that assessment, it (the sale) is void, because the tax which was levied under it is void, that is the taxes of 1871, 1872, 1873, and 1874 are void, all being under the same assessment. 1. Because no opportunity was given to the tax-payers to except or object to the said assessment before the same was acted on by the board January, 1871. Cooley on Tax. 228, 229, *et seq.* 2. The land was assessed by that roll at $1.25 per acre, and there being three hundred and twenty acres, the maximum tax that could be collected in 1874 was twenty-five mills on $400 of land, when it was sold for $16, and hence such sale was void. Not only because there was no default in the payment of tax of 1871, but because the assessment for 1866, 1867, 1868, 1869, and 1870, was void, they depending for their validity on the assessment-roll of 1866. We think it unnecessary to attack any assessment except that upon which the tax of 1874 is predicated, as this court has declared that a sale under the Abatement Act must be made for the tax of 1874, and cannot be made at all unless there was a delinquency prior to that year. We call attention to the act of 1871, p. 826, which provides that the assessment-roll shall be made out, and "the assessor shall complete and certify to it and append an affidavit as therein provided," and "deliver the same to the clerk of the Board

of Supervisors of his county," showing that all these things precede the filing.

We now proceed to the assessment-roll of 1871, certified to by W. F. Cross on the 7th of August, 1871. It certainly could not be filed before it was certified to. It was certified to on the 7th of August, 1871. Now, there is an order approving the land assessment-roll, filed July 1, or first Monday in July, 1871, as recited in the order. It could not have referred to the assessment-roll certified to by Cross, assessor, on August 7, 1871. The order of the board approving it was on the 11th of August, 1871, and there is none other for it to refer to except that certified to January 2, 1871 ; and if it was the one referred to, the land, for tax of 1874, could only be sold for a tax of ten dollars, as heretofore shown ; but it was actually sold for a tax of $16, as shown by the list of lands in the record, filed as the list which he sold under the Abatement Act. This can only be explained in this way : That the roll filed on January 2, 1871, is, and was, the one recited by the board to have been filed July 1, 1871 ; but the sheriff sold under the roll certified to on the 7th of August, 1871. If there was no other objection, the fact that no time was given, from the 7th of August, 1871, to the 11th of August (the time when said roll was certified to and approved, if approved at all), gave to the tax-payers no opportunity to file their objections to it, is fatal to the assessment. It is evident that the sheriff in making his sales under the Abatement Act, took the amount due from the roll of August 7th, 1871, as the amount for which the land is pretended to have been assessed there and the amount for which it was sold, agree in amount. See Acts 1871, p. 823, sect. 1.

The decree of the court below was predicated on the idea that the list of lands made out by the sheriff and tax-collector, and the tax charged to each piece of land was itself an assessment and conclusive on the parties. Now, by referring to the Abatement Act of 1875 (Session Acts, p. 14), it will be seen that said list is not an assessment and does not pretend to be

an assessment of lands, but is simply an ascertainment of what the assessment was — is predicated and founded on an assessment, and relies on an assessment for its foundation and facts. If that predicate — that foundation — is shown to be void, then its creature — its consequences — suffers the same fate. And we have shown that the assessments of lands of Holmes County from 1866 to 1875, are absolutely void and the sales thereunder are void.

*S. H. Hooker*, for the appellee.

The radical difference in the conclusions reached by defendant's attorneys and myself is caused to some extent by our views as to the objects and purposes of the Abatement Act. Counsel for the defendant strenuously insisted in the lower court, and we suppose will adopt the same argument here, that this was an attempt on the part of the State to sell its previously acquired title, and hence that the validity of the title of the purchaser under that sale depended on the validity of the title of the State to the land acquired under previous sales. We say, that under the Abatement Act, that all the taxes, except those of 1874, on the lands owned or claimed by the State were " abated," and such lands ordered to be assessed or listed and sold for the taxes of 1874 alone. It was not an attempt to sell the State's title; but to sell for the taxes of 1874. It was not necessary to make lands subject to sale under this act, that the State should be the owner or should have an absolute indefeasible title thereto; but the requirement of the statute was met if the State claimed the land. See sects. 1, 2, 5, 9, of Abatement Act, 1875. This land was first sold to the State in 1869, for the non-payment of taxes. It stood in that way unredeemed and paying no taxes until appellee became the owner. It was assessed in 1870 and 1871, as State lands. It was then claimed by the State. It had ceased to produce revenue. It came within the express provisions of the Abatement Act. We say it is immaterial whether the State acquired a good title by its purchase in 1869. It is sufficient for our purposes that the State ceased to collect

taxes on it, had it assessed to her and claimed it. The act of 1875 was then passed by the Legislature, directing that all prior taxes should be abated on it and that it should be listed, advertised, and sold for the taxes of 1874. The defendant is not harmed, he had refused to redeem, he had refused to pay the taxes on it, for about six years, and when all the taxes save those of 1874 were abated he still declines to pay. It was perfectly competent for the Legislature to have it sold for the taxes of 1874, even if it had never been sold to the State. They saw proper to order only the lands claimed or owned by the State to be listed and sold for the taxes of 1874, — those that had cessed to bear revenue. This land then belonged to that class of land which the Abatement Act, by its terms, included. The land was not sold by the auditor as conveying the State's title, but by the tax-collecter for the taxes of 1874, in the same manner tax-sales are usually made. All the requirements of the Abatement Act were substantially complied with. This brings us to consideration of the assessment-roll of 1870 and 1871. I can hardly conceive the object of the defendant as to the introduction of these rolls. The assessment-roll of 1871, as far as the same pertains to the land in controversy, is made an exhibit to defendant's amended answer. In it the land was listed at $2 per acre, the 320 acres was worth $640. The levy by the board with the State levies, amounted to 25 mills on the dollar, making a tax of $16, for which the lands were sold. The roll of 1870 fixed the value of the land at $1.25 per acre. But I do not see the effect that either of these rolls are to have upon the case; how it matters, as far as this case is concerned, whether they are void or not, as the land was not sold under either of them, but under an assessment-roll prepared by the officers under sect. 9 of the Abatement Act. We fail to see any connection between these rolls and sect. 9 of the Abatement Act. The Abatement Act contains all the provisions for executing itself. It is unnecessary to refer to any other statute or record in carrying out its provisions, except to show that the land

belongs to that class embraced in the terms of the act, *i.e.*, lands claimed or owned by the State. It contains its own provision for listing, and sale, and report. It is a scheme separate and distinct from the general revenue. When a due assessment, etc., is made, as required by that act, when that act is substantially complied with in charging the land, when a proper levy is made and the lands are sold for the non-payment of the taxes for the fiscal year of 1874, I fail to perceive why the title of the purchaser is not good; how it can be affected by a failure on the part of the revenue officers to comply with the requirements of the general revenue law in the previous sales.

COOPER, J., delivered the opinion of the court.

On the 1st of March, 1875, the State was, or claimed to be, the owner of an immense quantity of land, which had been sold to it for taxes of preceding years. These lands were, as the property of the State, exempt from taxation, and a general distrust as to the validity of the sales under which they had been acquired deterred persons from purchasing them from the State. A considerable portion of them had been purchased by the State prior to the year 1861; and in the destruction of records caused by the war, all evidence of title, as to a large portion of them, had been lost. Others of them had been acquired under tax-sales, made during the war, and the taxes for which they had been sold were composed in part of levies for the support of the armies of the Confederate States. Such sales had been declared void by the courts. The proceedings under which by far the greater part of them had been sold, were invalid, because of irregularities in the assessment and sales. The owners of these lands, finding them assessed to the State, and thus freed from taxation, and knowing that no title could be conferred by sales to purchasers from the State, were content to permit the continuance of the shadow which protected them from taxation, but did not threaten their possession. The evil was not only serious as it

existed, but was constantly and rapidly increasing.   It pressed
itself upon the consideration of the Legislature, and the result
was the passage of the act approved March 1, 1875, commonly
known as the " Abatement Act," by which all taxes for years
preceding the year 1874 were abated, and a resale ordered to
be made of all of these lands for the taxes of that year.   This
much we know ; some of it as a matter of public history,
though this is somewhat obscured by being recited in the title
of the act ; some of it, by reading the more general provis-
ions of the act itself, keeping clear of the darkness in which its
details are involved.   The act is a marvel of obscurity.   It is
composed of twenty-five sections, each of which is probably
unequalled, save only by its fellows, in prolixity and confu-
sion.   It is itself an amendment to a previous law.   It contains
an elaborated and involved machinery for its execution, and
by sect. 10, provides that " all parts of sects. 1697 to 1715,
inclusive, of chapter 22, article 9, Code of 1871, or [on] the
subject of sales of lands for taxes, and not inconsistent with
this act, or the previous laws of 1874 (regular session and
called sessions, 1873 and 1872), not in conflict with this act,
and changes in the revenue laws by amendment in the Code of
1871, and in the laws of 1874, 1873, and 1872, by changes
now provided for and in force, shall govern the form and man-
ner of sales of said lands."   By sect. 9 the lands are to be
subjected to sale " as required by sect. 1697 of the Code of
1871 and other laws provided for this purpose."

     Further confusion was obtained by referring in other parts
of the act to forms and instructions prepared in the auditor's
office, for the purpose of keeping correct accounts with the
various tax-collectors of the State.   An examination of this
act has impressed us with the conviction that what was the
Legislative will and intention as to the various details of the
act can never be known and scarcely approximated.   Fortu-
nately, however, a greater portion of it consists of instruc-
tions for settlements between the different fiscal agents of the
State, and more fortunately still, the adoption in the ninth

section of the Code provisions as to the sale of the land frees that question, at least, from all doubt.

There are two important inquiries involved in the consideration of sales made under this act, both of which are presented in the case before us.

First, did the Legislature contemplate a sale of the title only which the State then had in the lands, derived from previous tax-sales, or was it intended that the lands should again be proceeded against for the taxes of 1874 ; and second, if it was a new procedure against the lands, were the titles which would be conveyed by the sales dependent for their validity upon the regularity of the assessment of 1871 and of the orders of the Boards of Police of the different counties in levying the taxes of 1874, or did the act adopt the rolls as they then appeared, and the levies of taxes theretofore made, as fixing a valuation of the lands and the amount of the taxes for which it was subject for that year, curing, by such adoption, all irregularities which it was in the power of the Legislature to cure?

The act is stated by its title to be an amendment to that of April 2, 1874, which in turn was amendatory to the act of April 7, 1874, which was itself amendatory to the act of April 5, 1872. The acts of 1872, 1873, and 1874 in effect provided that the auditor of public accounts should furnish to the clerks of the Circuit Courts of the various counties the lists of lands held by the State under sales for taxes made subsequent to the first day of October ; that the circuit clerks should, for a certain length of time, hold said lands subject to redemption by the owners, after which time the lands should be subject to entry or purchase by third persons, and if purchased, the clerks should " execute said purchaser a deed conveying the State's title to the same." Acts 1872, sect. 5. Under these acts it is evident that a purchaser would get only the title which the State had acquired by its previous purchases. We think, however, the act of 1875 established a different policy and plan. The acts of 1872, 1873, and 1874 dealt only with lands the title to which was claimed by the State ; that of 1875

included in its provisions the lands held by the three Levee Boards, to which the State had no pretence of title. The acts of 1872, 1873, and 1874 permitted the owners of the lands to redeem the same within a fixed period, after which they were subject to purchase and could not be redeemed from the pur- chaser ⸰by the owners; that of 1875 directs that notice of its passage shall be given by the sheriffs of the various counties, " by publication and posters, notifying all former owners, agents, and representatives of said lands of the abatement of all taxes prior to the first day of January, 1874, as aforesaid, and to come forward and pay said taxes for 1874." Act 1875, sect. 6. A similar provision is made by sect. 22 for notice to be given by the auditor of public accounts in default of the payment of their taxes. The lands were to be sold at a spe- cified time, but a right of redemption was reserved to the owner for the period of one year upon the payment of the amount of the tax for which sale had been made and interest and costs of sale. If the State intended to sell only the titles then held by her, the lands held by the three Levee Boards would necessarily be excluded from its operation; but they are spe- cifically provided for, and it is evident that such construction must be placed upon the act as will insure and not defeat its object as to all the lands therein referred to, and since no other construction will produce this result, we conclude, that by such sales the State did not propose to sell only the title which it then held, but that a new title, deriving its efficacy from the proceedings under the act, was intended to be con- ferred.

This brings us to the consideration of the second question. For its proper consideration we must recur to the evils in- tended to be remedied, — the end to be attained. The funda- mental idea was to disencumber the State of the apparent ownership of a vast quantity of lands, title to which had not been obtained because of erroneous proceedings condemning it to sale for taxes. The State proposed to surrender these titles and to begin anew against the lands, for the purpose of

subjecting them to sale for the taxes of the year 1874. They were to be subject to sale, not under the general law governing the sales for taxes of delinquent lands, but under the provisions of the act itself. It was intended to offer to persons desiring to purchase, a title unaffected by the defects of those which the State had previously held. These lands, as we have said, appeared with their valuation upon the assessment-rolls of the counties in which they were situated. Here, then, was a valuation of the property, in many instances, no doubt, irregularly made, but, nevertheless, made by the constitutional officer in attempted conformity to law. The rate of taxation to be borne by taxable property had also been fixed prior to the passage of the act, that for State and levee purposes, by the revenue and levee laws, and that for county purposes by the Boards of Supervisors of the respective counties. It is probable that in many cases the limit of taxation allowed by law had been exceeded, or other irregularities had intervened which would have rendered a tax-sale void ; but the levies had, nevertheless, been made by the constituted authorities of the State in the attempted discharge of their duties.

In this condition of affairs the act was passed. It subjected the property thus assessed to the taxes thus levied. The necessity for its passage was the existence of irregularities in previous tax-sales. The object of the law was to enforce, by a valid sale, the charge thus imposed.

It cannot be denied that, for the purpose of making a future sale, the Legislature could, by special act, have cured all errors and irregularities in the assessment of the lands and the levy of the taxes, arising from the non-performance, or irregular performance, of any act which it might constitutionally dispense with for the future. If the act, then, had declared that the valuation of the lands therein mentioned, as appearing on the rolls theretofore filed, should be valid as an assessment, and that the taxes levied by the State and levee laws, and by the orders of the Boards of Supervisors of the several counties, should be adopted as fixing the charge for which they

were to be sold, this would have been an approval and rati-
fication of such rolls and such taxes, to the extent of curing all
defects which the Legislature possessed the power to cure,
and this, we think, it was the intention of the Legislature to do
by the act under consideration.   We gather this intent more
from the general scope and purpose of the act than from any
clearly expressed declaration; but any other construction
would reintroduce the very evils which necessitated its passage.

   We do not decide that the order of the Board of Supervis-
ors, made at its August term, 1871, had reference to the roll
of 1870 rather than to that of 1871.   This it is unnecessary to
determine.   If the order referred to the roll of 1871, the as-
sessment was valid and regular; if, on the other hand, it had
reference to that of 1870, it would only result in showing that
the roll of 1871 had never been approved at all by the board.
This irregularity, if it existed, was such as that it might be
cured by Legislative action, and was so cured by the operation
of the act as above explained.

   Affirmed.